**BRIDGEPORT FIREBIRD SOCIETY, et al., Plaintiffs,**

v.

**CITY OF BRIDGEPORT, et al., Defendants,**

**Firefighters for Merit Employment, Inc., et al., Intervening Defendants.**

**Civ. No. B–88–146 TFGD.**

United States District Court,
D. Connecticut,
Bridgeport Division.

May 17, 1988.

David N. Rosen, Rosen & Dolan, New Haven, Conn., Michael P. Koskoff, Koskoff, Koskoff & Bieder, Bridgeport, Conn., for plaintiffs.

Raymond B. Rubens, Thomas K. Jackson, Bridgeport, Conn., for defendants.

James F. Stapleton, Thomas J. Byrne, Day, Berry & Howard, Stamford, Conn., for intervening defendants.

## MEMORANDUM OF DECISION

DALY, Chief Judge.

The instant employment discrimination suit, brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, represents yet another chapter in the continuing saga of the efforts of many within the community to attain racial equality among the ranks of municipal employees in the City of Bridgeport. More specifically, the instant complaint alleges a cause of action under Title VII arising from the disparate impact predicted to result from the Bridgeport Civil Service Commission's utilization of the current list of candidates eligible to be promoted to the position of Fire Lieutenant, which list was generated by the first promotional examination administered for the Bridgeport Fire Department in over fourteen years. The plaintiffs and defendants have proposed a consent decree designed to alleviate the disparate impact, but the intervening defendants have voiced their objection to such a remedy. The review of the decree and the objections thereto are the subject of the instant ruling.

## BACKGROUND

On October 10, 1987, the City of Bridgeport Civil Service Commission administered a promotional examination for the rank of Fire Lieutenant within the Bridgeport Fire Department. A determination that the Bridgeport Fire Department has a long history of racial discrimination was made by this Court during the course of previous litigation involving the Department's entry level examinations. *See Ass'n. Against Discrimination v. City of Bridgeport,* 479 F.Supp. 101, 104 (D.Conn.1979) (hereinafter *A.D.E.*), *aff'd in relevant part,* 647 F.2d 256 (2d Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982). As a result of that litigation, and as part of the Court's order, the Department was precluded from making any permanent promotions until enough time had passed for a sufficient number of minority firefighters to earn the requisite time-in-grade to qualify to take a promotional examination. *A.D.E.,* 479 F.Supp. at 117. Consequently, the October examination was the first of its kind in the Department in over fourteen years, and the first in which any minority now in the Department has ever been able to compete. The need for the examination and the promotions cannot reasonably be questioned. Presently, there are no permanent Captains or permanent Lieutenants in the Department, leaving nineteen vacancies at the rank of Fire Captain and seventy-four at the rank of Lieutenant.

Of the 206 firefighters who sat for the October examination, 47 were minorities. Of the 150 candidates who passed the examination, 17 are minorities. Under § 211 of the Charter of the City of Bridgeport, the Civil Service Commission must certify candidates for promotion in the strict rank order as they appear on the eligibility list. Charter of the City of Bridgeport, § 211 (Rev.1984 & 1986) (formerly § 9).[1] This procedure is commonly referred to as the "rule of one." Should the "rule of one" be utilized to select candidates from the October eligibility list, only three of the seventy-four firefighters promoted to Lieutenant will be minorities (a circumstance that will not change under the decree). In other words, of all non-minorities who took the examination, 83.6% passed, and only 34% of the minority candidates passed. Further, under the "rule of one," 44.6% of the non-minority candidates compared to only 6.4% of the minority candidates, appear in the

---

1. The selection procedure for the examination consisted of three components: a written examination weighted as 50% of the candidate's total score; an oral examination weighted as 45%; and a seniority score, weighted as 5%.

first seventy-four spots [2] from which promotions initially will be made.[3] Thus, the selection ratio for minorities is only 14.3% of the selection ratio for non-minorities.

The plaintiff, the Bridgeport Firebird Society, is an organization of minority firefighters in the Fire Department. Some of its members failed the October examination, while other members passed the October examination, yet did not place within the first seventy-four ranks on the eligibility list. Members of these two sub-groups also are named plaintiffs. Shortly after the results of the examination were announced, but before they were validated officially, the plaintiffs brought this action claiming that the results of the examination would have a disparate impact upon minorities, and that the examination was not justified by business necessity in that it was not valid and job-related. For the alleged violation of Title VII, the plaintiffs sought injunctive and other relief.

On March 11, 1988, after hearing counsel for both parties in chambers, the Court granted a temporary restraining order that enjoined the promotion of anyone from the eligibility list generated from the October examination. The order was extended on March 21, 1988, and a hearing on the plaintiffs' motion for a preliminary injunction was scheduled for March 24, 1988. On March 22, 1988, the Firefighters for Merit Employment, Inc. ("FME"), an organization consisting of 188 Bridgeport firemen (only three of whom are non-minorities), including 111 out of 133 who passed the October examination, moved, pursuant to Fed.R.Civ.P. 24(a), to intervene as of right. The motion to intervene was granted as was FME's motion to continue the hearing until the first week of May.

In the meantime, the plaintiffs and defendants reached an agreement that would dispose of the action, and submitted to the Court a proposed consent decree ("the de-

cree"). The decree has four major components and is appended hereto. First, the seventy-four permanent Lieutenant positions will be filled in rank order from the eligibility list, and any additional vacancies that may arise from resignation, retirement, etc., will be filled in rank order from the remainder of the eligibility list. Second, nineteen additional persons will be appointed to the position of Lieutenant. These nineteen additional spots will arise from the provisional appointment of nineteen of the permanent Lieutenants to the rank of Fire Captain.[4] The nineteen additional Lieutenant positions normally would be filled provisionally through a selection process within the Fire Chief's discretion. Pursuant to the decree, however, nine of these nineteen additional Lieutenant positions will be filled from the eligibility list in rank order, and ten will be filled in rank order by minority candidates who have passed the examination. If any of these additional appointees permanently vacates his position during the life of the eligibility list, his replacement will be chosen alternately from the highest remaining candidate on the eligibility list and the highest remaining minority on the eligibility list. Third, because the City Charter allows provisional appointees to serve for only 120 days during each year, groups of provisional Captains will be rotated back to the rank of permanent Lieutenant. Under the decree, each group of provisional Captains shall include the same proportion of minorities as are in the Lieutenant rank as a whole. Fourth, the life of the eligibility list generated from the October, 1987 examination will be extended six months so that it will not expire until November 9, 1990.

Should the decree be approved, thirteen minorities will be appointed, together with eighty non-minorities, all of whom passed the examination. In other words, 27.7% of the minority candidates and 50.3% of the

---

**2.** The next highest minority candidate after the rank of seventy-four, is at rank number ninety-four.

**3.** The life of the Lieutenant's list is two years. During that time approximately six or seven additional promotions can reasonably be expected. Thus, no candidate beyond the rank

number eighty-one has a reasonable expectation of being promoted from this list.

**4.** To be eligible for the rank of permanent Fire Captain, a lieutenant must satisfy a three year time-in-grade requirement.

non-minority candidates who took the examination will be selected. Thus, the effect of the consent decree would be to increase the comparative selection ratio of minorities to non-minorities from 14.3% to approximately 55%.

The standard error of measurement—a device that measures the significance of differences in test scores—is 6.7 points for the October examination. This means that candidates who scored within 6.7 points of each other should be treated as equally qualified for the position for which the test was designed. After the rank of seventy-four on the eligibility list, the next candidate who is a minority is at rank number ninety-four. Since the candidate at rank number ninety-three (the last of the additional appointments were they all to be made in strict rank order) scored 63.80 and the last candidate on the eligibility list scored 57.28, the standard error of measurement allows all candidates between ranks ninety-three and the last rank to be treated as equally qualified. Thus, the selection procedure proposed in the decree for the nineteen additional Lieutenants does not present a selection procedure significantly less valid than if a strict rank order procedure was employed.

At a hearing to determine whether the decree should be approved, the intervenors objected. First, they asserted that because the intervenors are parties to the action and have legal rights under the Bridgeport City Charter that will adversely be affected by the decree, their approval is required. Alternatively, they argued that the decree represents an illegal race-conscious remedy because there is no showing of predicate discrimination that would justify its imposition and, even if there was a predicate of discrimination, the remedy is not properly tailored to the goal sought by the parties. The Court conducted a dual purpose evidentiary hearing. The first purpose was to determine whether, in fact, the intervenors had a vested contractual or other legally protected interest that would adversely be affected by the decree. The second, in case the intervenors did not prevail on their threshold showing, was to provide an opportunity to the intervenors to voice their objections to the decree.

## DISCUSSION

Because a voluntary settlement or compromise is the preferred means of "achieving Title VII's goal of eliminating employment discrimination," they enjoy a "presumption of validity" and should be approved absent a showing that they are "unreasonable, unlawful, or against public policy." *Kirkland v. N.Y. State Dep't. of Correc. Services*, 711 F.2d 1117, 1128–29 (2d Cir.1983) (citations omitted), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed. 2d 230 (1984). Unless the intervenor makes a showing that the decree affects the subject of collective bargaining, a contract right, or that it imposes some duty or obligation on the intervenor to which it does not consent, it cannot preclude or block a decree merely because it objects. *United States v. City of Miami*, 664 F.2d 435, 445–47 (5th Cir.1981) (*en banc, per curiam*); *Kirkland*, 711 F.2d at 1127, 1134; *see Local No. 93 v. City of Cleveland*, 478 U.S. 501, 106 S.Ct. 3063, 3079, 92 L.Ed.2d 405 (1986). Should the intervenor fail to make the showing necessary to block the decree, it still must be given the opportunity to "air its objections" as to the reasonableness of the decree, *Local No. 93*, 106 S.Ct. at 3079, or to show that the decree is unlawful, or against public policy. *See Kirkland*, 711 F.2d at 1129.

### I. *Standing of Intervenors to Object*

The burden rests with the intervenor to establish that it has a legally protected right under the applicable state law sufficient to give rise to standing to block the decree. *See Kirkland*, 711 F.2d at 1127–28; *City of Miami*, 664 F.2d at 447. On this issue, FME presented evidence that all of its members are civil servants, most of whom are located at various positions on the eligibility list, and are entitled to the protections provided by Civil Service Regulations; further, that the Charter for the City of Bridgeport provides that promotions be made in accordance with one's relative excellence on the examination, and

that the time-in-grade for a position cannot be changed by the Civil Service Commission absent the consent of the City's labor negotiator and the union. It is clear that FME has failed to meet its burden as a matter of law.

■ First, the relevant statute provides that:

[t]he conduct and grading of merit examinations, the rating of candidates and the establishment of lists from such examinations and the initial appointments from such lists ... shall not be subject to collective bargaining, provided once the procedures for the promotional process have been established by the municipality, any changes to the process proposed by the municipality concerning the following issues shall be subject to collective bargaining: (1) The necessary qualifications for taking a promotional examination; (2) the relative weight to be attached to each method of examination; and (3) the use and determination of monitors for written, oral and performance examinations. In no event shall the content of any promotional examination be subject to collective bargaining.

CONN.GEN.STAT. § 7–474(g) (1972 & Supp.1988). The decree does not affect any of the concerns addressed in the enumerated provisions of the statute, but rather affects only the rating of candidates and the initial appointments from a list, neither of which may be a part of a collective bargaining agreement. Thus, it appears that no member of FME, presumably a party to such an agreement, has a contract right that may be affected by the decree.[5] *Cf. D'Agostino v. New Britain,* 7 Conn. App. 105, 109–10, 507 A.2d 1042 (1986) (where the subject of the dispute is not within the scope of a collective bargaining agreement, grievance procedures established by such agreements do not apply), *cert. denied,* 200 Conn. 806, 512 A.2d 229 (1986); *Local 773, AFL–CIO v. City of Bristol,* 39 Conn.Sup. 1, 463 A.2d 628, 630 (1983) (union has no standing on the basis

of collective bargaining agreement to bring suit to enjoin municipality from curving grades of promotional examination).

■ The intervenors also suggest that § 211 of the City Charter affords them a right to be promoted only in accordance with the "rule of one" insofar as the relevant provision requires that candidates' appointments be made from eligibility lists "in the order of their relative excellence on the test." Charter of the City of Bridgeport, § 211. This position is without merit. Section 211 must be read in conjunction with § 211.1 of the same Charter. *Id.* (adopted by referendum, 1984). That provision requires the Civil Service Commission and the City Personnel Director to take affirmative steps to insure that examinations are nondiscriminatory, that they are based on valid indicators of an applicant's skills and abilities for the prospective position, and that the selection procedure comply with all relevant laws and regulations concerning the appointment of persons to municipal positions. *Id.* Furthermore, although Connecticut requires strict compliance with civil service regulations, *Walker v. Jankura,* 162 Conn. 482, 490, 294 A.2d 536, 540 (1972), the requirement must yield to a federal court order in furtherance of the goals of Title VII. *Santora v. Miklus,* 199 Conn. 179, 506 A.2d 549, 556 (1986); *see* U.S. Const. art. VI, cl. 2. At best, the provisions of the City Charter provide the firefighters ranked on the Lieutenant eligibility list only with a mere expectation of promotion, which does not rise to the level of a legally protected interest, especially in the face of "presumptively discriminatory employment practices." *Kirkland,* 711 F.2d at 1126. Neither FME, nor its members are in a position to block the decree by withholding their consent; however, they may have input into the Court's evaluation of the reasonableness and lawfulness of the decree. *See Local No. 93,* 106 S.Ct. at 3079.

In the absence of an intervenor who has standing to block the decree, the Court, in

---

5. The intervenors failed to produce any evidence regarding the provisions of any contract or collective bargaining agreement.

determining the propriety of a voluntary Title VII settlement, need only conduct two basic inquiries: "(1) whether there is an existing condition which can serve as a proper basis for the creation of race-conscious remedies; and (2) whether the specific remedies of the compromise agreement are neither unreasonable nor unlawful." *Kirkland,* 711 F.2d at 1129. The intervenors took advantage of the opportunity to have input into these inquiries, yet the Court finds their position on the relevant issues untenable and, in any case, insufficient to persuade the Court that the decree is not an appropriate one.

## II. *The Predicate of Discrimination*

■ A prima facie case of discrimination can be made upon a showing that "the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). The Uniform Guidelines on Employee Selection promulgated by the EEOC, which are entitled to "great deference," *id.* at 431, 95 S.Ct. at 2378, are instructive in determining the existence of a prima facie case. The so-called "four fifths" rule of those guidelines provide:

> [a] selection rate for any race, sex, or ethnic group which is less than four-fifths ($\frac{4}{5}$) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact.

29 C.F.R. § 1607.4(D) (1987).[6] The 6.4% selection ratio for minorities, compared with the 44.6% selection ratio for non-minorities in the first seventy-four ranks on the present eligibility list, reflects a comparative selection ratio of 14.3%, which falls well below the eighty percent standard, and establishes a "sufficiently serious claim of discrimination." *Kirkland,* 711 F.2d at 1130.

■ The intervenors argue that the demonstration, through statistical analysis, of a prima facie case of adverse impact does not alone satisfy the requirement that a predicate of discrimination be established before a race-conscious remedy is imposed. This position is contrary to the prevailing authority. In *Kirkland,* the court held that "a showing of a prima facie case of employment discrimination through a statistical demonstration of disproportionate racial impact constitutes a sufficiently serious claim of discrimination to serve as a predicate for a voluntary compromise containing race-conscious remedies." 711 F.2d at 1130. While a statistical prima facie case can satisfy the predicate requirement, other factors such as those present here, *see A.D.E., supra,* also may establish a "sufficiently serious claim of discrimination." *Bushey v. New York State Civil Serv. Comm'n,* 733 F.2d 220, 226 & n. 7, 228 (2d Cir.1984), *cert. denied,* 469 U.S. 1117, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985).

■ The intervenors also appear to suggest that, because the prima facie case is rebuttable through job-related explanations, the approval by the Court of a race-conscious remedy is inappropriate. This view is contrary to both the policy in Title VII cases that favors voluntary compliance, and the relevant law of this circuit. *Bushey,* 733 F.2d at 226; *Kirkland,* 711 F.2d at 1128. Instead, a municipality that seeks voluntarily to rectify a perceived violation of Title VII need not rebut a case of discrimination by a demonstration of job-relatedness. *Bushey,* 733 F.2d at 226. The entrance into the settlement represents an acknowledgment of unlawful discrimination, and eliminates the need for a judicial determination of the issue. *Kirkland,* 711 F.2d at 1131, 1132; *see Bushey,* 733 F.2d 228, n. 11 (citing *United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979)); *cf. Youngblood v. Dal-*

---

**6.** The "four fifths" rule may not be a valid indicator of adverse impact when applied to exceptionally small groups. *See Bushey v. New York State Civil Serv. Comm'n.,* 733 F.2d 220, 226 (2d Cir.1984) (four fifths rule does not apply to group of four; finding of discrimination must rest upon other factors), *cert. denied,* 469 U.S. 1117, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985). The size of the present applicant pool renders the "four fifths" rule a valid indicator of adverse impact.

*zell,* 804 F.2d 360, 364 (6th Cir.1986) (entrance of municipality into decree represents a recognition by the municipality of a compelling interest in providing opportunities to minorities who wish to be firefighters and move up through the ranks), *cert. denied,* —— U.S. ——, 107 S.Ct. 1576, 94 L.Ed.2d 767 (1987). Thus, the unrebutted prima facie case created by the October eligibility list is sufficient to serve as a proper basis for a race-conscious remedy such as the one contemplated in the decree. *Bushey,* 733 F.2d at 228; *Kirkland,* 711 F.2d at 1131.

### III. *Permissiveness of the Decree's Remedy*

A proposed remedy for an alleged Title VII violation that is a product of a voluntary settlement must be "substantially related to the objective of eliminating the alleged instance of discrimination," and "must not unnecessarily trammel the interests of affected third parties." *Kirkland,* 711 F.2d at 1132. The Supreme Court has employed four criteria to evaluate the permissiveness of a race-conscious remedy incorporated by a voluntary agreement. *United Steel Workers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).[7] It must be: (a) "designed to break down old patterns of racial segregation;" (b) but cannot "unnecessarily trammel the interests of white employees;" and (c) must constitute only a "temporary measure," (d) that is designed "not to maintain a racial balance but simply to eliminate a manifest racial imbalance." *Weber,* 443 U.S. at 193, 99 S.Ct. at 2722; *cf. Youngblood,* 804 F.2d at 364–65.

■ First, although great strides in action and cooperation have been made by the City, the Fire Department, and the Civil Service Commission, the history of discrimination within the Department and its effects cannot easily be escaped. *See A.D.E., supra.* More than one hundred members of the Fire Department now are minorities, yet the October examination represents the first instance in recent times that a minority firefighter could compete for a promotion to Lieutenant and, under the current eligibility list, only three will be promoted to Lieutenant. The intervenors' argument that past findings by the Court, witnessed in *A.D.E., supra,* relate only to discrimination in entrance requirements or are not relevant because they are not timely, is disingenuous at best. *Cf. Youngblood,* 804 F.2d at 365.

Second, the decree does not interfere with the promotion of non-minority candidates who would otherwise have been appointed to the first seventy-four Lieutenant vacancies under the "rule of one." In fact, the promotion opportunities of non-minority candidates will be enhanced, since more will permanently be appointed than those who, under the present list, have a reasonable expectation to such during the life of the list. Thus, some non-minorities will be helped by the decree, but none will be harmed by it. In light of these facts, as well as the findings herein that no protected contract rights either exist or will be adversely affected, the decree cannot reasonably be said to "trammel" the interests of non-minority candidates.

Third, although the life of the present list is extended under the decree, it remains a temporary measure. The time-in-grade requirement for a Captain is three years as a Lieutenant. Clearly, then, it would be impossible for anyone permanently to be appointed to Captain before the present Lieutenant eligibility list expires.[8] The six month extension facilitates an increase in permanent promotions to Lieutenant from the present list, and fulfills the Fire Department's personnel requirements.

---

7. Although the agreement in *United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), was between a private employer and a union, the same analysis is still appropriate in cases involving a public entity. *Bushey,* 733 F.2d at 227 n. 8; *Youngblood v. Dalzell,* 804 F.2d 360, 365 (6th Cir.1986) (same analysis applies when a public entity is charged with both a Title VII and an equal protection violation), *cert. denied,* —— U.S. ——, 107 S.Ct. 1576, 94 L.Ed.2d 767 (1987).

8. There is no movement afoot to either reduce the time-in-grade requirement for Captain, or to develop the next test for Captains, a process that normally consumes several years.

The last of the four *Weber* criteria also is satisfied. The decree is neither designed, nor intended, to eliminate the disparate impact of the examination, only to alleviate it. It does not achieve or maintain a racial balance but only increases the number of minorities and non-minorities to be promoted, while increasing the minority selection ratio to little more than half of that for non-minorities.

Nevertheless, the intervenors claim that the decree is not "narrowly tailored" to its goal, especially since there exist race-neutral alternative remedies—such as random selection from the pool of qualified candidates, and that promotions on the basis of a "strict racial quota" is neither justified nor reasonable. The first part of this claim is without merit. Certainly, a race-conscious remedy must be "narrowly tailored" to attain a legitimate goal in furtherance of a compelling government interest. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274, 106 S.Ct. 1842, 1846, 90 L.Ed.2d 260 (1986) (citing *Fullilove v. Klutznick*, 448 U.S. 448, 480, 100 S.Ct. 2758, 2775, 65 L.Ed. 2d 902 (1980) (opinion of Burger, Ch. J.)); *Youngblood*, 804 F.2d at 365. The goal sought by the parties to the decree is to alleviate a lopsided comparative selection ratio. While achieving this goal the decree benefits many, both black and white candidates who are qualified, and harms no one who has a reasonable expectation of promotion to a permanent position from the present eligibility list. Even with the decree, the selection ratio of non-minorities remains almost twice that of minorities. In light of this fact, the intervenors cannot reasonably argue that the remedy is not well-suited to its goal. *Cf. Youngblood*, 804 F.2d at 365.

Equally unpersuasive is the argument that the "strict racial quota"[9] is not acceptable. A race-conscious selection procedure, such as the one incorporated in the decree, that is designed as a short-term remedy, is neither unreasonable nor illegal if it "mandate[s] the appointment of members of the plaintiff-class who are victims of the de-

fendant's discrimination, and ... the number of victims to be appointed—in relation to the total number of ... appointees" is calculated "by reference to the percentage of the victims within the total applicant pool." *Kirkland*, 711 F.2d at 1134–35. Given the relative equality under the standard error of measurement of all the candidates on the bottom portion of the current list, the small ratio of minority Lieutenants relative to all the minority examinees, and the fact that more non-minorities will be promoted under the decree than under the current list, the Court finds the remedy eminently reasonable, and "substantially related" to the elimination of the adverse impact posed by the October examination. *Id.* at 1132, 1134–35.

## CONCLUSION

In light of the foregoing, the intervenor's objections are overruled, and the proposed consent decree is hereby approved and shall be executed forthwith.

It is SO ORDERED.

## PROPOSED CONSENT ORDER

WHEREAS the plaintiffs have brought this action under Title VII of the Civil Rights Act of 1964, as amended, and

WHEREAS the named defendants and the plaintiffs agree to the entry of the following order, and

WHEREAS the named defendants and the plaintiffs agree, and the Court finds, that the following order will fairly and reasonably accommodate the claims of all the parties and, in particular, will alleviate the adverse impact of the 1987–1988 Lieutenants' examination without unduly trammeling the interests of any non-minority candidates, and

WHEREAS, the City of Bridgeport wishes to implement the provisions of this order as a voluntary affirmative action program as well as in settlement of all plaintiffs' claims arising out of this lawsuit,

---

9. To label the selection procedure for the nineteen additional Lieutenants as a "strict racial quota" is a misnomer. Although the race of a candidate is a criterion for promotion, it is not the sole criterion.

NOW THEREFORE, it is hereby ORDERED, ADJUDGED, AND DECREED, as follows:

1. All the permanent vacancies which now exist at the rank of Lieutenant shall be filled from the existing eligibility list in rank order;

2. a) Simultaneously with the appointments described in paragraph 1, the City will make 19 additional appointments to the rank of Lieutenant. These appointments are required because nineteen of the persons appointed to the rank of Lieutenant will immediately be assigned as provisional Captains.

b) These nineteen appointees would ordinarily have been provisional appointees. However, the City shall treat these appointees as permanent appointees for all purposes.

c) These nineteen appointees shall be selected as follows: nine shall be selected from the existing eligibility list in rank order, and ten shall be the ten highest ranking minority candidates on the eligibility list who have not already been chosen pursuant to paragraph 1 above.

3) Vacancies which occur in the rank of Lieutenant thereafter during the life of the current eligibility list shall be filled in rank order from the list, except as provided by paragraph 4, below.

4) The following positions shall be filled as vacancies arise during the life of the current Lieutenant list, alternately with the highest remaining candidate on the eligibility list and the highest remaining minority candidate on the list, beginning with the highest remaining candidate on the eligibility list:

a) Any Lieutenant vacancy, which would ordinarily be filled provisionally, created by the appointment of an additional provisional Captain if any permanent Captains vacate their positions due to promotion, retirement, resignation, or for any other reason.

b) Any vacancy created if any of the persons appointed pursuant to paragraph 2 above permanently vacates his position due to resignation, retirement or any other cause.

c) Any vacancy created if any of the persons appointed pursuant to paragraphs 4 a) or 4 b) permanently vacates his position due to resignation, retirement or any other cause, subject to the limitations of paragraph 5 below.

5) When the provisional Captain positions referred to in paragraphs 2 and 4 are filled by permanent Captain appointments, the Lieutenants who have been appointed to Captain positions will not be replaced. (Instead, the full complement of Lieutenants will be maintained by the reversion to Lieutenant status of the provisional Captains who are not appointed permanent Captains.)

6) Provisional Captains shall be appointed for terms not to exceed 120 days, except that if all Lieutenants have served 120–day terms as provisional Captains, then all Lieutenants will be eligible for a second term of provisional appointment. Each group of provisional Captains shall include a proportion of minorities equal to the proportion of minorities among the rank of Lieutenant.

7) The current Lieutenants' eligibility list shall expire November 9, 1990.