Wilbur **PAHAHAM** and William **Rogers, Plaintiffs,**

and

**Danbury Guardians Association, Inc., Forel Lance Brevard, James Brown, James Cole, Larry Johnson, Gordon MacCalla, Edward McCall, and Takisha Watson, Movants,**

v.

**DANBURY POLICE DEPARTMENT, DANBURY, CONNECTICUT, Defendant.**

No. 5:92 CV 0073 (GLG).

United States District Court, D. Connecticut.

Oct. 15, 1997.

---

Jerry V. Leaphart, Danbury, CT, for Movants.

Daniel E. Casagrande, Wendy A. Grispin, Pinney, Payne, VanLenten, Burrell, Wolfe & Dillman, P.C., Danbury, CT, for Defendant.

### DECISION ON MOTION TO INTERVENE AND FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR PRELIMINARY INJUNCTION

GOETTEL, District Judge.

The hiring of fifteen new police officers by the City of Danbury since April, 1996, and the anticipated hiring of ten to thirteen additional officers, has prompted the recent activity in this case, which had been settled by a consent order nearly three years ago. Seven individuals and the Danbury Guardians Association, Inc., have moved to intervene in this action claiming that the consent order confers upon them a right which cannot be protected adequately without their participation in the lawsuit. (Alternatively, they seek permissive intervention). The seven individuals include one present member of the Danbury Police Department and six applicants for entry level positions as police officers. Five of the applicants passed the most recent Civil Service examination but, with one possible exception, are not ranked high enough on the current eligibility list to be considered for appointment before the eligibility list expires. All of the prospective intervenors are African American[1] and the Danbury Guardians Association is composed of present and former African American Danbury police officers. If intervention is granted, the movants[2] seek preliminary injunctive relief to prevent the City from filling any vacancies for entry-level police officer pending a final determination of the movants' claims.

After several status conferences with counsel, two full days of evidentiary hearings, and the submission of trial memoranda, the court renders the following findings on the motion to intervene and the motion for a preliminary injunction.

## BACKGROUND

### THE PAHAHAM ACTION

Plaintiffs Wilbur Pahaham and William Rogers were City of Danbury policemen who commenced an action in early 1992 against the Police Department and the City of Danbury, alleging that they were discriminated against by the failure of the City and Police Department to offer them training opportunities, promotional examinations, and special assignments because they were African Americans. The action was concluded by a consent order on December 2, 1994. In the consent order, the defendants concede that

---

1. In this case the plaintiffs' counsel has chosen to refer to his clients as African Americans (without the hyphen). Since we assume that that is the preference of the clients, we too will use that phrase hereafter in this decision.

2. Technically, the motion for preliminary injunction was not filed by all of the current movants, but rather by Adolph Andrews, Elliot Brevard, and George E. Johnson, individually and in their capacities as officers of the Danbury Guardians Association, Inc. Andrews, E. Brevard, and Johnson have not sought to intervene in this action and, therefore, do not have standing to bring this motion for preliminary injunction in their individual capacities. The Danbury Guardians, however, has sought intervention, which as discussed below will be granted.

the plaintiffs were unlawfully denied training opportunities as alleged in their complaint, but otherwise deny liability. The order then details the manner in which training opportunities will be made available to all members of the police force and how special assignments [3] and promotions will be distributed and awarded. The order describes the retirement and pensions of the two plaintiffs (who had sought disability retirement and are no longer with the force) and the lump sum payments to be made to them, as well as the awarding of attorney's fees and the mechanisms for monitoring and enforcing the order.

Pertinent to the present application, Paragraph V.2. states that the City shall:

> update its Affirmative Action Plan and Utilization Analysis to take into account the underutilization of African–Americans in the Danbury Police Department resulting from the retirement of two African–American officers. The updated plan shall detail specific steps that will be taken to redress underrepresentation and to enhance promotional opportunities for African–Americans in the Danbury Police Department. The Department will act in compliance with this plan.

The court retained jurisdiction to hear and decide disputes arising under the order (Paragraph X.3.).

### THE AFFIRMATIVE ACTION PLAN

At the time of the consent order, the City of Danbury had an Affirmative Action Plan in place which included a utilization analysis. It has been revised twice since the consent order. The most recent revision, dated February 2, 1996, states in the utilization analysis that the police force has 136 members and the City has a population of 65,585. The figures for total population are then extracted racially on the basis of the population of persons eighteen years and over.[4] Based on that adult population, the City believes that slightly over 6% of the population are African Americans and that, if the utilization in the Police Department matched the City's demographics,[5] there would be eight African American police officers whereas there are now only three. At the time of the commencement of the original *Pahaham* suit, there were five African American police officers but, as indicated, the two named plaintiffs then took disability retirement. We are told that earlier there were as many as eleven African American police officers. Consequently, based upon the City's utilization analysis, the Police Department is short five African American police officers. The situation with Hispanics was relatively similar (although it has improved with the recent hiring of three Hispanic officers) but is far worse with respect to Asians where there is only one Asian police officer, although Asians make up 5% of the adult population.

The Equal Employment Opportunities Policy Statement is basically to the effect that everyone shall have equal opportunities with respect to employment by the City and use of its facilities. If further states that successful performance on affirmative action

---

3. The term "special assignment" includes all positions available to police officers in the Department involving special duties and responsibilities, but excludes the position of Chief of Police and all positions subject to the Civil Service testing requirements. It includes assignments such as emergency services division, detective bureau, dispatcher, traffic, bicycle patrol, among others. Since the entry of the consent order, the position of detective has become a promotional position subject to Civil Service merit testing. "Special assignments" are to be distinguished from "special police officers," discussed *infra*, which are part-time police officers who are not part of the classified service and are not subject to the entry level examination for those positions.

4. It is unclear why the City uses the age of 18 for comparison purposes, since the minimum age for a police officer is 21. It may be that these are the only statistics available. All police officer applicants are required to have a high school diploma or an equivalent education certified by the State Board of Education.

5. The City uses its own population statistics as a basis for comparison apparently based upon the belief that it is advantageous for a police department to represent the demographic make-up of the city that it serves. We note, however, that these figures do not necessarily represent the demographic composition of the relevant applicant pool since Danbury does not have a residency requirement and accepts applications nationwide, although it appears that most are from Connecticut or neighboring New York counties.

goals will provide positive benefits for the City through fuller utilization and development of previously underutilized human resources.

As to affirmative action, in terms of recruitment and hiring, the most recent plan says:

VI. *Development and Implementation of Program to Eliminate Discriminatory Barrier to Achieve Goals*

A. Review and Revise present practices in the following:

1. Recruitment
2. Interviewing
3. Application Forms and Pre–Employment Inquiries
4. Selection and Testing
5. Upward Mobility
6. Layoff and Union Contracts

(This appears to be identical to what was contained in the 1995 Affirmative Action Plan).

## ADMINISTRATION OF THE CIVIL SERVICE REGULATIONS

The City of Danbury has adopted a merit system for appointment and promotion of employees pursuant to §§ 7–407—7–424, Conn. Gen.Stat. Municipalities that adopt this system are required to administer examinations[6] to applicants for positions in the classified service, Conn. Gen.Stat. § 7–413, ranking the persons in the order of their "relative excellence as determined by the test." Conn. Gen.Stat. § 7–414. The appointing officer[7] then appoints from a limited number of candidates according to the municipality's civil service rules (here the top six)[8] "who stand highest upon the register for the class or grade to which such position belongs." Conn. Gen.Stat. § 7–416.

The Civil Service Rules and Regulations require all qualified candidates to be ranked on the basis of a final score. The final score is comprised of the raw score obtained on the exam[9] plus certain preference points. The most common preference points are given for being a military veteran who served in time of war, for which five points are given.[10] There is another preference available for persons who are "special police officers"— temporary police officers appointed on an interim and as needed basis. These persons can receive up to ten preference points if they have passed the Civil Service examination and meet the other requirements of the Danbury Code, including the performance of at least 160 hours of service as special police officers for each year for which the applicant seeks a preference.[11] One of the plaintiffs, James Cole, has served as a special police officer but he did not receive any preference points since he failed one of the four parts of the examination.[12] (To pass the examination, an applicant must pass all four parts). No one else on the current eligibility list has received such preference points.[13]

With the preference points added, a final score is reached. Forty-five persons were

6. The examinations are to be "practical in their character and shall relate to those matters which will fairly disclose the relative capacity of the persons tested to discharge the duties of the position to which they seek to be appointed, and may include test of mental qualification, of physical qualification and health and, when appropriate, of manual or technical skill." Conn. Gen. Stat. § 7–413.

7. In this case the Mayor is the appointing authority, whose decisions are confirmed by the City Council.

8. Danbury Civil Service Commission Rules and Regulations § VI B.2.

9. One person scored 100%, two scored 99% and four scored 98%. The numbers scoring percentages less than that gradually increase as the percentage score declines. Forty-two persons scored 95% or above.

10. Under a rare circumstance involving disability, applicable only to one passing applicant, a disabled veteran can get ten preference points. In this instance, the disabled veteran has had difficulty in passing the physical agility test. The veterans and disabled veterans preferences are a requirement of Conn. Gen.Stat. § 7–415.

11. Two points are given for each year of service up to a total of 10 points maximum.

12. Danbury Code § 15–17(I).

13. Another person, a white woman, was initially given preference points, placing her toward the top of the eligibility list but it was then determined that she did not meet all of the requirements in terms of hours of work and those preference points have been taken away from her.

found to have final scores of 95 or higher and were sent for the additional tests.[14] The tests include a physical agility test,[15] background screening including a polygraph test, a physical exam, a stress test and a psychological test. All of these tests are pass/fail tests, which cannot add any points to the applicant's final score but, if failed, disqualify the candidate completely.

The procedure of the City to date has been to send a sufficient number of candidates for the other tests such that, based on a predicted failure rate, the Civil Service Commission will still have a sufficient number to meet the Civil Service requirement of having the Mayor select from the top six applicants. The net effect of this "Rule of 6" is that, if more than one position is to be filled, the Mayor must be given at least five more names than the number of positions to be filled, since as each position is filled, the person who had previously been seventh will move forward to sixth. The Mayor may select any one of the top six persons. In so doing, he sometimes takes into account the psychological testing which is not strictly a pass/fail situation. (Candidates are evaluated as being low risk candidates, medium risk candidates or high risk candidates and the Mayor has the authority to consider that in making his selection from the top six).[16]

### THE MOST RECENT POLICE OFFICER ENTRY TEST

The City's Affirmative Action Compliance Officer and Acting Chief Civil Service Examiner testified that the major step taken by the City has been to stimulate the number of minorities who take Civil Service examinations for various positions, including the police force. At least with respect to the entry level police officer examination, it appears that these outreach efforts have been somewhat successful. The number of African Americans taking the police officer examination increased from 18 in 1993 to 28 in 1996.

Based upon a report from the company which administered and graded the most recent police officer entry test, 414 persons took the test of which 28 were African Americans. That amounts to 6 ¾ which is slightly higher than the percentage of African Americans in the demographic population. However, with respect to the number passing the test, of the 255 who did pass only 13 were African Americans, which is approximately 5%, somewhat less than their demographic percentage. Similar statistics were recorded by Hispanics and other minority groups.[17] (Women, however, regardless of race, did substantially better than the men).

The City has clearly indicated its desire to appoint African American applicants to the police force if such can be done consistent with Civil Service regulations. Merely passing the Civil Service test, however, does not come close to assuring appointment to the force. Out of 255 passing applicants, only fifteen persons have been selected to date,[18] and they have been selected from the top of

**14.** This number was based upon recommendations received by the Acting Chief Civil Service Examiner from the polygraph examiner, who indicated the number that he believed should be sent for background tests, based upon his experience as to the failure rate. The decision was reported to the Civil Service Commission and approved by the Mayor.

**15.** Until fairly recently the physical agility test was the first test given to candidates toward the top of the eligibility list. At that point the test was administered by the City. Now the test is administered at the Police Academy and is the last test given. If someone has passed all of the other tests and has been selected by the Mayor for appointment, he is sent to the Police Academy where his initial requirement is to pass the physical agility test.

**16.** Another factor that enters into his consideration is that, as has occurred with several highly placed candidates recently, they ask not to be considered at the present time. For example, one had a pending promotion in the New York City Police Department to the rank of Sergeant while another lives in California and has children in school and does not wish to be considered for another year or so for that reason.

**17.** The testing company reported that the passing rate for all groups conformed to the guidelines of the 80% rule of the Uniform Guidelines on Employee Selection. The validity of the police officer examination was not an issue before us, and we have not made an independent assessment in that regard.

**18.** Of the fifteen police officers selected, two were white females, three were Hispanic males,

the list (persons scoring 95% or higher on the test or having a final score of 95 or higher when preference points are added).

Only one African American (not a person seeking to intervene) had a final score high enough to be considered on the list of eligibles sent to the Mayor. He was, in fact, was sent for the additional tests referred to above. The polygraph examination and background examination revealed that he was a high risk to the City as a police officer, based upon prior drug usage, the sale of illicit drugs, and a minor prior criminal record. The Mayor indicated his disappointment in not being able to hire an African American, but disqualified him because of the background check and polygraph. (Movants' counsel argues his past behavior should be ignored but the Civil Service Rules and Regulations, Section VII C.4.c. and d., require disqualifying such applicants).

There are now ten vacancies on the force with possibly three more which may be funded with federal grants in the not too distant future.[19] Even with those positions added, it is unlikely that the persons selected from the eligibility list can rank any lower than 60th on the original list. At most, only one of the prospective intervenors has any possibility of even being considered. Edward McCall, who was 89th on the original eligibility list and is now 52nd on the revised list (which has been revised to eliminate those already promoted, those who failed the other qualifying tests, and those who asked to be removed from consideration), is the only prospective intervenor who has even a remote chance of moving into the top six when the additional ten to thirteen positions are filled.[20]

## THE INSTANT MOTIONS

### THE ARGUMENT OF THE PROSPECTIVE INTERVENORS

The prospective intervenors disclaim seeking quotas or preferences based upon their race. However, they challenge the manner in which the Civil Service regulations are being administered, claiming that several white candidates have been given preferences to which they are not entitled. We find no substance to the plaintiffs' allegations. Veterans preferences were appropriately given to a few applicants, as required by State law. Moreover, even if those preferences were voided, it would not make a sufficient change in the eligibility list to assist the movants.

The movants also challenge the City's failure to administer the physical agility test and other tests to all applicants who passed the written examination. This is based in large part upon the Announcement for the Examination for Police Officer and their interpretation of the phrase "final earned ratings" in the Civil Service Rules and Regulations, by which the applicants, are to ranked. There is nothing, however, in the Civil Service Rules and Regulations that requires the final earned rating to include anything other than the written examination score and preference points. Moreover, since the other tests are pass/fail, they cannot add points improving an applicant's standing on the eligibility list.

The Announcement for the Examination for Police Officer provided on page 3 that passing scores on the written examination "will be admitted to:," after which the announcement lists the physical agility test, the background screening, and the physical ex-

---

and ten were white males. Eleven of these appointments were made in May of 1996, one in August of 1996, and the last three in September of 1996.

19. The City has recently received a supplemental COPS Universal Hiring Program grant award from the United States Department of Justice for three new, additional full-time officers. The award was for $25,000 for each officer for a three-year period. Because the cost of hiring a new police officer is substantially greater than $25,000 per year, these three additional positions will have to be approved and funded by the City

Council before the City accept the COPS grant award.

20. Forty-five individuals were sent for additional testing to fill a total of 15 positions. Therefore, it seems safe to conclude that, even if 13 positions are available, someone who is 52nd on the list will not get reached. However, the list is more than a year old, and it is possible that one or more of the people above McCall have been hired elsewhere and are no longer interested. Additionally, it is unknown whether there will be another round of hiring from this list, which does not expire until April 12, 1998.

amination, with a description of each. The movants interpret the Announcement as requiring all passing applicants to proceed through all of the remaining tests. The Acting Chief Civil Service Examiner testified that the Announcement was in error, and that it has not been the practice of the City to administer these additional tests to all of the applicants with passing test scores. He further testified that this year, because the physical agility test is not being administered by the City, but rather by the Police Academy, it is not being given until after the new officers are selected. However, if they fail the test twice, they will not be admitted to the training program. While the movants challenged this procedure, they presented no evidence whatsoever that this procedure had a disparate impact on African Americans or that it was implemented for purposes of excluding minority applicants.

At bottom the movants are contending that the consent decree requires the City to address the underrepresentation of African Americans on the police force either by making changes in the Civil Service Regulations or finding ways to avoid them in order to appoint more African American candidates. They also argue that the three positions which may be created by the federal grant award ("COPS") are pursuant to significant equal employment opportunity requirements. We have reviewed the grant terms and find that they impose no different hiring requirements from existing laws and regulations. *See* 28 C.F.R. §§ 42.201–42.308.

### INTERVENTION

The prospective intervenors have filed a proposed complaint in intervention. The first two counts allege violations of Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. The third count alleges intentional infliction of emotional distress by defendants,

and the fourth count asserts a breach of the December 2, 1994 consent order. While the original *Pahaham* complaint asserted violations of Title VII and section 1981, the alleged violations did not relate to the defendants' failure to hire African Americans. As noted above, the *Pahaham* action challenged the City and Police Department's promotion, training and special assignment practices. Only the fourth count of the movants' proposed complaint in intervention, alleging a violation of the consent order with respect to training and promotional opportunities, has any relationship to the original action.

■ Intervention is governed by Rule 24, Fed.R.Civ.P.[21] Rule 24(a), Fed.R.Civ.P., permits intervention as of right where timely application is made and either:

(1) ... a statute of the United States confers an unconditional right to intervene; or (2) ... the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Because none of the movants contend that any statute of the United States provides them with an unconditional right to intervene, we need only focus on subsection (2) of Rule 24(a). To intervene as of right, a movant must meet the following requirements:

(1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; and (4) the

---

**21.** The movants in this case are in a different posture than many prospective intervenors in cases in which consent decrees have been entered. Generally, the scenario is that the would-be intervenors are attempting to challenge actions taken by a municipality pursuant to a consent decree. In those cases, 42 U.S.C. § 2000e–2(n) may come into play. Here, however, the applicant-movants are not challenging actions

taken pursuant to the consent decree but are attempting to invoke one of its provisions to require the City to change its hiring practices to increase the number of African Americans hired as entry level police officers. Therefore, 42 U.S.C. § 2000e–2(n) does not apply, and we need only consider whether under Rule 24 these nonparties should be allowed to intervene.

applicant's interest must be inadequately represented by the existing parties to the suit.

*Edwards v. City of Houston,* 78 F.3d 983, 999 (5th Cir.1996). Failure to satisfy any one of these requirements precludes intervention as of right. *Id.* The inquiry under Rule 24(a)(2) is a flexible one, which examines the particular facts surrounding the application for intervention. *Id.*

In this case, the applicant-movants' primary obstacle to intervention is the requirement that they have an interest relating to the "property or transaction which is the subject of the action." With respect to movants' claim that the Civil Service Regulations should not stand in the way of the appointment of African American candidates, we find nothing in the consent decree that concerns or supports that claim. While a respectable argument can be made that the present Civil Service Regulations do not necessarily provide the best list of eligible candidates, the evidence did not establish that the Regulations or their administration has been manipulated in any fashion to discriminate against African Americans or that they have had an adverse impact on African Americans. (Indeed, as noted above, the company administering the test determined that the examination complied with the Guidelines on Employee Selection). Thus, we do not find that the movants have demonstrated that their challenge to the defendants' adherence to the Civil Service requirements sufficiently relates to the *Pahaham* litigation and consent decree to support their intervention as of right.

■ Moreover, the consent decree affords no basis for intervention or relief with respect to their challenge to the City's hiring practices. "While a consent decree is a judicial pronouncement, it is principally an agreement between the parties and as such should be construed as a contract." *Crumpton v. Bridgeport Education Association,* 993 F.2d 1023, 1028 (2d Cir.1993). The scope of the decree is discerned within the document and not by what might satisfy the desires of the plaintiffs in that action. *Firefighters Local No. 1784 v. Stotts,* 467 U.S. 561, 574, 104 S.Ct. 2576, 2585–86, 81 L.Ed.2d 483 (1984). A court construing a consent decree therefore is " 'not entitled to expand or contract the agreement of the parties as set forth in the consent decree.' " *Crumpton v. Bridgeport Education Association, supra,* 993 F.2d at 1028 (*citing Berger v. Heckler,* 771 F.2d 1556, 1568 (2d Cir.1985)).

■ The consent decree in this action merely required the updating of the City's Affirmative Action Plan and compliance therewith. It did not suggest ignoring the Civil Service selection requirements, nor does it address hiring except to the extent that the "underutilization" of minorities could be considered to relate to hiring. However, we find that the hiring claims are so significantly different and unrelated to those involved in the original action that they cannot be said to "relat[e] to the property or transaction which is the subject of the action." Rule 24(a)(2), Fed.R.Civ.P. There also is nothing in the consent order that would impair or impede the ability of the applicant-movants to protect their interests through an independent challenge to the City's testing and hiring practices.[22] *Id.* Thus, we find that the applicant-movants are not entitled to intervention as of right.

■ Additionally, pursuant to Rule 24(b), Fed.R.Civ.P., intervention may be permitted upon timely application where "an applicant's claim or defense and the main action have a question of law or fact in common." The hiring claims have nothing in common with this action except that they, like this action, are asserted by African Americans. Permissive intervention is entirely discretionary with the court. *United States Postal Service v. Brennan,* 579 F.2d 188, 191 (2d Cir.1978).

■ We also deny the applicant-movants permissive intervention. To permit this action to be reopened after three years to allow the addition of allegations that are significantly different and more extensive that those in the original action would unduly

---

**22.** This case is distinguishable from *NAACP v. Town of East Haven,* 70 F.3d 219 (2d Cir.1995), in which the plaintiffs specifically challenged the job-relatedness of the town's selection procedures and presented evidence of the disparate impact of these procedures on blacks.

complicate the initial litigation and would prejudice the defendants. Consequently, as to the applicant-movants, we deny the motion to intervene. This determination is without prejudice to the institution of any new litigation those applicants may choose to pursue challenging the methods presently being used to select police officers in Danbury.[23]

■ With respect to plaintiff Forel Lance Brevard and, to a lesser extent, James Cole and the Danbury Guardians Association, Inc., the asserted basis for intervention is somewhat different. Brevard complains about the defendants' failure to give him a promotion or a special assignment, and the Danbury Guardians more generally complain about promotion practices with respect to African Americans. Cole has a number of claims that do not relate to the consent decree but he has one concerning training and assignments as a special police officer that may relate.[24]

Defendants argue that their motion for intervention should be denied as being untimely since almost three years have passed since the order was entered. We note initially that this court retained continuing jurisdiction to hear and decide disputes arising from the consent order. Moreover, claims concerning training and promotion are cumulative and continuing. While there may not have been grounds a few years ago for Brevard, Cole and the Danbury Guardians Association to raise these issues, such claims may be ripe at this time.

Additionally, the claims that these individuals seek to assert relate to the defendants' implementation of the consent order and alleged violation of that Order. Thus, we find that they relate to the subject matter of the original action. Because the original plaintiffs are no longer police officers and because the claims are specific to the individual movants, the original plaintiffs may not adequately be able to represent their interests. To the extent that we are allowing their claims, this will not unduly prolong the litigation or result in prejudice to the original parties.

Thus, we find that they are appropriate parties to be allowed to intervene in this action but solely in connection with promotion and training and not with respect to the selection of new applicants. Only the Fourth Count of the Intervenors' Complaint will be allowed. An amended complaint should be filed on behalf of the three movants whom we have allowed to intervene.

### THE MOTION FOR A PRELIMINARY INJUNCTION

■ "As a general matter, entry of a preliminary injunction is appropriate where the party seeking an injunction establishes (1) that the injunction is necessary to prevent irreparable harm and (2) either a likelihood of success on the merits or a sufficiently serious question going to the merits of the claim as to make it a fair ground for litigation plus a balance of hardships that tips decidedly in favor of the moving party." *Phillip v. Fairfield University*, 118 F.3d 131, 133 (2d Cir.1997). The second "serious question" prong is also frequently termed the "fair ground for litigation" standard. *Able v. United States*, 44 F.3d 128, 130–31 (2d Cir. 1995). However, where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the "fair-ground-for-litigation" prong may not be considered.

---

**23.** One possibility might be an attempt to establish that the strict rank order certification of eligible candidates violates Title VII, as was the case in *Bridgeport Guardians, Inc. v. City of Bridgeport*, 933 F.2d 1140, 1149 (2d Cir.), *cert. denied*, 502 U.S. 924, 112 S.Ct. 337, 116 L.Ed.2d 277 (1991). If a finding of disparate impact should occur (a finding which we do not make at this time), a "banding" approach might be allowed, which would permit the City to choose from other than the direct rank order of candidates. Defendants argue that § 106 of the 1991 amendments to Title VII, 42 U.S.C. § 2000e–2(1), may prohibit this. We express no opinion.

**24.** In their opposition papers, the defendants treat the training and assignments for special police officers in the same manner as for full-time police officers in the classified service, and as subject to the requirements of the consent order. This was a subject not explored at the hearing. While the consent order does not specifically mention training and assignments for special police officers, we have no reason to treat this matter any differently than the defendants have in their moving papers and, thus, presume that the consent order governs training and assignments for special police officers as well.

*NAACP v. Town of East Haven*, 70 F.3d 219, 223 (2d Cir.1995) (*citing Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)). In such a case, the moving party must establish to the satisfaction of the court both irreparable injury and a likelihood of success on the merits. *Id.*

Similar to the Second Circuit's holding in *NAACP v. Town of East Haven, supra,* where the City administers civil service examinations and hires police officers pursuant to municipal regulations and state civil service laws, this case involves the movants' attempts to enjoin governmental action taken in the public interest pursuant to a statutory and regulatory scheme. Thus, the movants must establish both irreparable harm and a likelihood of success on the merits.

The Supreme Court has held that the denial of job opportunities, training, and promotional opportunities may constitute "serious or irreparable harm." *Carson v. American Brands, Inc.,* 450 U.S. 79, 89 & n. 16, 101 S.Ct. 993, 999 & n. 16, 67 L.Ed.2d 59 (1981). Thus, we focus our inquiry on the second requirement, whether the movants have carried their burden of proving a likelihood of success on the merits.

### The Motion for a Preliminary Injunction—Hiring

The motion for preliminary injunction is primarily addressed to the contention that those applying to be policemen have been improperly denied selection because of their race. As noted above, movants disclaim any right to a quota or preference but argue that since the consent decree speaks of an affirmative action plan which would deal with underrepresentation of African Americans on the force, it is incumbent upon the City to find a way to employ more. The City's response, as put forth by its Mayor and its Affirmative Action Officer, is that it would be more than happy to employ additional African American police officers and, indeed, has recently created a minority hiring task force, but that it must comply with the Civil Service Regulations and that it is these Civil Service Regulations that have kept the applicant-movants from being considered. To this the movants reply that the City and this court have discretion to alter or avoid the Civil Service regulations in order to accomplish the desirable end of having more African American policemen. The movants point out that, except for preferences for veterans and special police officers, the eligibility list is established entirely upon the results of the written test. While they do not challenge the job relatedness of the test or the accuracy of its grading and application to the African American applicants,[25] they decry the use of such a purely intellectual exercise as being the determinant for police employment.[26]

We do not dispute the claim that there are other important considerations in the selection of police officers beyond their knowledge and intellect. In fact, these factors are taken into consideration in the actual selection process, although they are not factored into the final score, which determines an applicant's rank on the eligibility list. The Announcement for the Police Officer Examination provides:

> All appointments shall be made by the Mayor and confirmed by the Common Council. Subject to the provision of the Civil Service Rules and Regulations, selection shall be based on an applicant's standing on the eligibility list as well as the results of the physical agility, psychological and physical examination. Consideration may also be given to the personal health habits of the applicant.

25. One applicant claims that he was given a better grade and ranking than is reflected on the City's eligibility list. He has presented a copy of the form sent to him in which the original grade and rank has been crossed through and a better grade and rank inserted. The City's records contradict this. We find no need to resolve this issue because, even with the improved eligibility position which he claims, he would still not be high enough on the eligibility list for consideration during the next round of hirings.

26. Movants argue that the test score is intended to be only a "tie breaker." It is a tie breaker only when those given preferences have the same score as those who were not given such preferences.

Although the Mayor as the appointing authority is given a List of Eligibles from which to make appointments, he is not given test scores or final scores. He testified that, in selecting among the six applicants whose names he has been given, he takes into consideration other factors, including the results of the background investigation, including the polygraph test.

The major purpose of the Civil Service System is hiring and promotion on merit without political or personal connections favoring any application and without discrimination of any sort limiting any applicant. Whether other components of the selection process should be graded on a basis other than pass-fail is an issue that is not before us in this action.[27]

We find, moreover, that to allow racially preferential considerations would be contrary to the provisions of the consent order which provides that nothing in it shall "be construed to limit the rights of any person under the Affirmative Action Plan of the City of Danbury." (Consent Order ¶ V.1). The purpose of the Affirmative Action Plan is to see that no one is discriminated against. Any favoritism shown to African Americans would be in contravention of the rights of other applicants, including minorities such as His-

panics who might be displaced in favor of an African American.

Since we have found no basis for the applicant-movants to intervene in this action, it is unnecessary for us to decide the motion for a preliminary injunction which relates solely to hiring.[28] However, as the above remarks make clear, we see no legal basis for granting injunctive relief, although we do not doubt that many, if not all, of these individuals would make fine police officers.

### The Motion for Preliminary Injunction— Training and Promotion [29]

■ While we have allowed Officer Brevard, Special Police Officer Cole, and the Danbury Guardians Association, Inc., to intervene, little evidence was presented on the subject of training and promotion.

With respect to Officer Brevard, we make the following findings of fact. He has been employed as a patrolman for eleven and one-half years. He has not been promoted during that period. While he claims that the other twenty officers who were appointed with him have all been promoted, we find that not to have been the case. Only five of the twenty have been promoted, although two others have been appointed as detectives.[30] What Brevard really points to is the

27. The problems in this regard are quite similar to the ongoing debates concerning standards for admission to competitive colleges and graduate schools. As a recent article in *The Connecticut Law Tribune* points out:

> The current assault on standardized tests is not about heartlessness or humanitarianism. It comes from people seeking to reach an old end by new means.
>
> The end—laudable in itself—is roughly proportional representation of black and Latino students at America's most selective universities and graduate schools. The new means is to stop or limit use of every measure of academic qualification on which blacks and Latinos do less well (on average) than whites and Asians. And that happens to include every objective measure of cognitive capacity or academic achievement that has ever been devised, or ever will be, until more black and Latino children get decent educations in their early years.
>
> \* \* \* \* \* \*
>
> Remember that universities started using SATs in the first place to break down the hierarchies of WASP privilege that had kept

> out Jews and other groups, and to make academic capacity the main criterion for admission.

Closing Argument, Slamming the Gates of Opportunity by Stuart Taylor, Jr., *The Connecticut Law Tribune*, September 29, 1997, pp. 18–19.

28. The City has voluntarily agreed to keep six prospective positions open pending decision on these motions. With this decision the City's obligations are discharged.

29. We recognize that the Motion for Preliminary Injunction did not specifically address promotions and training. It sought only a freeze on hiring. However, over two days of testimony were heard on both issues and the parties addressed the issue of promotions and training in their arguments to the court. Therefore, we will treat this issue in this ruling.

30. The lowest level detective does not outrank a patrolman although it is an assignment that pays better than being a patrol officer. The position of detective has now become a tested position but was not so during all of the last dozen years.

fact that all of the remainder, at one time or other, had special assignments which he considers more desirable than being a patrolman. These include such things as being a bicycle patrolman, a Union officer,[31] a dispatcher and a Traffic Division member. Brevard was particularly interested in joining the Traffic Division which, *inter alia,* investigates automobile accidents. He wrote a letter requesting such an assignment and shortly thereafter the Division was disbanded. He contends that the Division's disbandment, which was supposed to be temporary, was done for the sole purpose of preventing his joining it. There is inadequate evidence to reach such a conclusion. Moreover, many of those who had assignments which Brevard considers desirable are no longer in those assignments but are back on patrol with him.

In 1994 and 1996 Brevard took the test to become a Sergeant but failed it. He also took the test to become a detective and failed that. No evidence was presented as to how many took and passed these exams or their racial composition. We have no evidence from which to conclude that his lack of promotion or lack of special assignments violates the consent order.

With respect to James Cole, although he makes claims relating to his training and assignments, his testimony related primarily to other issues, particularly his application to become a full-time police officer, and nothing of any consequence was offered with respect to training or promotion as a special police officer. Therefore, we find, based upon the evidence presented, that these intervenors have not demonstrated a likelihood of success on the merits that would justify the granting of a preliminary injunction.

### CONCLUSION

Accordingly, we GRANT the Motion to Intervene [Doc. # 61] of the Danbury Guardians Association, Inc., Forel Lance Brevard, and James Cole as to the Fourth Count. We DENY the Motion to Intervene [Doc. # 61]

of James Brown, Larry Johnson, Gordon MacCalla, Edward McCall, and Takisha Brown. We DENY the Motion for Preliminary Injunction [Doc. # 47]. Plaintiff-intervenors are directed to file an amended complaint in accordance with this decision within twenty days of the date hereof.

**SO ORDERED.**

---

31. Brevard lists "Former Union President" as one of the special assignments of which he complains, although this is not listed as a "special assignment" in the consent order, and it seems unlikely to us that this would be considered as such by the Department. He also lists "K–9 Officer," which is another assignment not included in the consent order's definition of "special assignment."